# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

CITY OF BURLINGTON, a
Washington municipal corporation,

Appellant,

v.

WASHINGTON STATE LIQUOR
CONTROL BOARD, a Washington
Agency; HAKAM SINGH and JANE
DOE SINGH, and the marital
community composed thereof; and
HK INTERNATIONAL, LLC, a
Washington limited liability company,

Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

NO. 72438-0-I

DIVISION ONE

PUBLISHED OPINION

FILED: May 26, 2015

2015 MAY 26 AM 8: 51
COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED

LAU, J. — The City of Burlington, Washington, appeals the Washington State Liquor Control Board's decision to grant a spirits license to Hakam Singh and to allow Singh to relocate the license from the previously state-run location to a small convenience store he already owned.[1] The City argued the Board exceeded its statutory authority by allowing Singh to relocate the spirits license. The trial court

---

[1] We refer in this opinion to all respondents as "the Board."

rejected the City's appeal, concluding the City lacked standing to seek judicial review of the Board's action under the Administrative Procedure Act (APA), chapter 34.05 RCW. Because the Board's action directly impacts the City's interest to protect the safety of the public by ensuring alcohol sales are properly regulated, and because the City presented sufficient facts to demonstrate an injury in fact, we conclude the City has standing to challenge the Board's relocation of Singh's license. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## FACTS

In November 2011, Washington voters approved Initiative Measure No. 1183 (I-1183), a measure privatizing liquor sales. I-1183 directed the Washington State Liquor Control Board to "sell by auction open to the public the right at each state-owned store location . . . to operate a liquor store upon the premises." I-1183 § 102(4)(c); RCW 66.24.620(4)(c). On April 20, 2012, respondents Hakam Singh and HK International (HK) submitted the highest bid for a liquor retail license at former Board Store No. 152, then located at 912 South Burlington Boulevard, in Burlington, Washington. On May 7, Singh submitted a store relocation request to the Board. Singh indicated that the landlord refused to lease at the original store location. Singh proposed a new location: the Skagit Big Mini Mart, a gas station and convenience store he already owned, located at 157 South Burlington Boulevard, approximately one half-mile north of the original store location. On May 14, the Board notified the City of Burlington about Singh's relocation request in compliance with RCW 66.24.010(8). Should the City object, the Board's notice form directed the City to "attach a letter to the Board detailing

-2-

the reason(s) for the objection and a statement of all facts on which [the City's] objection(s) are based." Administrative Record (AR) at 36.

On May 30, the City responded objecting to the new location and requesting an adjudicative hearing before the Board took any final action. The City included a brief letter detailing its reasons for the objection. First, the City argued that the Board lacked the legal authority to relocate the license attached to Store No. 152 because "[t]he clear language of [RCW 66.24.620(4)(c)] provides that the rights to be sold by the Board are linked to the then-current location of the liquor store." AR at 37. Second, the City noted that language in the voter pamphlet indicated that I-1183 "prevent[ed] liquor sales at gas stations and convenience stores . . . ." AR at 38.[2] Finally, the City expressed concern regarding how the liquor sales might affect the surrounding area, stating, "The Burlington Police Department has logged many calls to the proposed license location, reflecting the high level of crime that occurs at the licensee's business." AR at 39. The City also emphasized that the proposed location is just over 500 feet from Burlington High School.[3] The Board solicited comments from its own enforcement officer, who repeated the City's concerns: "One of the Investigative Aids I work with goes to that high school and he says he knows kids who buy alcohol there all the time. . . . As a liquor

---

[2] Generally, the Board could only issue a license to retailers whose premises were comprised of "at least ten thousand square feet of fully enclosed retail space within a single structure . . . ." RCW 66.24.630(3)(a). However, there is an exception to this requirement for those who, like Singh, purchase at auction a license to operate a former state liquor store. RCW 66.24.630(3)(c).

[3] If the minimart were within 500 feet of the school, the Board would have had to notify the school and could not have issued the license if the school objected. RCW 66.24.010(9).

officer and a parent I am concerned a spirits license for this premises is an invitation to add to the serious problem of youth access to alcohol." AR at 41.

On August 31, the Board issued a Statement of Intent to Approve Liquor License Over the Objection from the City of Burlington. The Board found no liquor violations at that location in the past four years, the City's challenge of the Board's interpretation of I-1183 was not grounds for denial, and "[t]he City did not demonstrate any conduct that constitutes chronic illegal activity as defined by RCW 66.24.010(12) at this premise." AR at 30. On September 11, the Board issued a final order denying the City an adjudicative hearing and issuing the license for the minimart.[4]

The City promptly appealed the Board's decision to Thurston County Superior Court. The City's opening brief asserted it had standing. The Board's response brief challenged the City's standing. After oral argument, the trial court allowed the parties to "supplement the record" with up to five pages each on the standing issue. Report of Proceedings (RP) (Jul. 19, 2013) at 40. The City submitted declarations from three individuals: Burlington Mayor Steve Sexton; City Planning Director Margaret Fleek, and City Police Lieutenant Tom Moser. The Board moved to strike this evidence, arguing that the court requested additional briefing, not evidence. The court struck the declarations, clarifying that it invited the parties to submit supplemental briefing only. In its oral ruling, the court apologized for any confusion and emphasized that "it was never the intent of the Court that there be supplemental declarations submitted . . . ." RP (Aug. 23, 2013) at 21.

---

[4] Singh and HK also requested a hearing.

-4-

The court dismissed the City's petition for judicial review for lack of standing. The court found that the City failed to meet the "injury in fact" test "because there was no immediate, concrete or specific injury really that was argued or put into the record by the City, and the few statements that were made were really conjectural and hypothetical." RP (Aug. 23, 2013) at 34. The trial court also denied the City's "request to overturn the Board's grant of a liquor license to HK International LLC." Clerk's Papers (CP) at 225. The City appeals.

## ANALYSIS

### Standard of Review

Standing is reviewed de novo. In re Estate of Becker, 177 Wn.2d 242, 246, 298 P.3d 720 (2013). When reviewing a party's standing, this court stands in the same position as the superior court. Patterson v. Segale, 171 Wn. App. 251, 257, 289 P.3d 657 (2012). The party seeking judicial review of agency action—the City—bears the burden of establishing standing. KS Tacoma Holdings, LLC v. Shorelines Hr'gs Bd., 166 Wn. App. 117, 127, 272 P.3d 876 (2012).

### Standing

The APA delineates standing requirements that differ from the general standing test applicable in other contexts:

> A person has standing to obtain judicial review of agency action if that person is aggrieved or adversely affected by the agency action. A person is aggrieved or adversely affected within the meaning of this section only when all three of the following conditions are present:
> (1) The agency action has prejudiced or is likely to prejudice that person;
> (2) That person's asserted interests are among those that the agency was required to consider when it engaged in the agency action challenged; and

-5-

(3) A judgment in favor of that person would substantially eliminate or redress the prejudice to that person caused or likely to be caused by the agency action.

RCW 34.05.530. "These three conditions are derived from federal case law."[5] Seattle Bldg. & Const. Trades Council v. Apprenticeship & Training Council, 129 Wn.2d 787, 793, 920 P.2d 581 (1996) (citing St. Joseph Hosp. & Health Care Ctr. v. Dep't of Health, 125 Wn.2d 733, 739, 887 P.2d 891 (1995). The second prong is the "zone of interest" test, while the first and third prongs constitute the "injury-in-fact" test. Allan v. Univ. of Wash., 140 Wn.2d 323, 327, 997 P.2d 360 (2000).

### 1. Zone of Interest[6]

The parties agree that the City satisfies the zone of interest test. Nevertheless, the City's unique and compelling interest adversely affected by the Board's action here merits further discussion.

The zone of interest test limits judicial review of an agency action to litigants with a viable interest at stake, rather than individuals with only an attenuated interest in the agency action:

> [N]ot every person who can show an injury in fact should be permitted to have judicial review. There are many people potentially affected by agency action in a complex interdependent society. To permit them all to seek review would overburden both the courts and the agencies. Hence, the courts have felt that a further filter was needed . . . . [T]he [zone of interest] test seeks another rational means for limiting review to those for whom it is most appropriate. Here, the focus is on legislative intent. . . .

---

[5] The APA expressly states the Legislature's intent that "the courts should interpret provisions of this chapter consistently with decisions of other courts interpreting similar provisions of other states, the federal government, and model acts." RCW 34.05.001.

[6] Although the zone of interest test focuses on legislative intent, much of our zone of interest test discussion applies equally to the injury in fact test.

[T]he underlying question is whether the legislature intended the agency to consider the applicant's interests when taking the action it took.

William R. Andersen, The 1988 Washington Administrative Procedure Act—An Introduction, 64 Wash. L. Rev. 781, 824–25 (1989);[7] see also Trades Council, 129 Wn.2d at 797 ("The test focuses on whether the Legislature intended the agency to protect the party's interests when taking the action at issue." (quoting St. Joseph Hosp., 125 Wn.2d at 739–40)).

Here, the Board's action treads directly upon the City's broad zone of interest regarding the licensing of liquor stores within its borders. The licensing statute explicitly protects the City's interest by providing a statutory right to object to a proposed license and request a hearing:[8]

> [B]efore the board issues a new or renewal license to an applicant it must give notice of such application to the chief executive officer of the incorporated city. . . .
>
> . . . .
>
> (c) The incorporated city . . . has the right to file with the board within twenty days after the date of transmittal of such notice . . . written objections against the applicant or against the premises for which the new or renewal license is asked. . . .
>
> (d) . . . [T]he city or town . . . may request and the liquor control board may in its discretion hold a hearing . . . .

---

[7] Andersen is a professor of law at the University of Washington. Professor Andersen was a member of the Washington Bar Association Task Force which proposed the 1988 Administrative Procedure Act to the state legislature. His authoritative article has been cited in numerous appellate cases.

[8] The City correctly asserts that it had statutory standing in the administrative process. That fact distinguishes the City from Mrs. Allan. Allan v. Univ. of Wash., 140 Wn.2d 323, 997 P.2d 360 (2000). (Wife of university professor lacked standing to challenge revisions to faculty code. Court rejected her argument that she should have standing as a part of her husband's marital community, asserting an interest in his income. It concluded that she failed to show a concrete interest of her own and also that her asserted interest is one that the agency is required to consider.)

RCW 66.24.010(8). Further, the statute requires the Board to give "substantial weight" to the City's objections regarding chronic illegal activity:

> In determining whether to grant or deny a license or renewal of any license, the board must give substantial weight to objections from an incorporated city or town or county legislative authority based upon chronic illegal activity associated with the applicant's operations of the premises proposed to be licensed . . . . "Chronic illegal activity" means (a) a pervasive pattern of activity that threatens the public health, safety, and welfare of the city, town, or county including, but not limited to, open container violations, assaults, disturbances, disorderly conduct, or other criminal law violations, or as documented in crime statistics, police reports, emergency medical response data, calls for service, field data, or similar records of a law enforcement agency . . . .

RCW 66.24.010(12). Indeed, the legislature has declared that the statutory scheme for liquor licenses be read as a means for local government to protect the health and safety of its constituents:

> This entire title shall be deemed an exercise of the police power of the state, for the protection of the welfare, health, peace, morals and safety of the people of the state, and all its provisions shall be liberally construed for the accomplishment of that purpose.

RCW 66.08.010. In Sukin v. Wash. State Liquor Control Bd., 42 Wn. App. 649, 710 P.2d 814 (1985), Division Three of this court held that the Board properly considered objections raised by the city of Spokane even though those objections were submitted past the 20-day statutory time limit. Sukin, 42 Wn. App. at 652–53. The court stated that reading the statute in a more restrictive way "would frustrate the purpose of the liquor control act as expressed in RCW 66.08.010." Sukin, 42 Wn. App. at 652–53. That purpose, quoted above, recognizes the City's compelling interest to protect the health and safety of its citizens. RCW 66.08.010.

Cities like Burlington are uniquely situated in the liquor license statutory scheme because of their interest in regulating alcohol sales within their borders.[9] The statute's purpose expressly reflects this interest. RCW 66.08.010. There is no doubt that alcohol sales are heavily regulated due to its profound impact on public safety. See Liquor Act, Title 66 RCW.[10]

Further, the statute provides procedural protections for this interest by requiring the Board to consider and give due weight to the City's objections to licenses. RCW 66.24.010(8)–(12). Section 103(3)(b) of I-1183 provides that the issuance of a liquor license is subject to RCW 66.24.010.[11] Indeed, it is difficult to imagine a litigant more appropriately suited to challenge the Board's action than the City under these circumstances. When an applicant's license is denied, that applicant unquestionably suffers an injury to his zone of interest sufficient to confer standing to appeal. But where, as here, the Board issues an alleged illegal license, no person or entity possesses a more compelling interest for standing purposes than the City. We conclude that the Board's action directly implicates the City's broad interest spelled out in the plain language of the statute.

---

[9] The City correctly asserts that it "is a general purpose government responsible for ensuring public safety. See, RCW 35A.11.020. As such, Burlington has a statutory interest in the enforcement of regulations governing alcohol sales." CP at 31.

[10] "Initiative Measure 1183 (I-1183), which privatizes our state liquor industry, allows hard liquor to be sold at grocery stores and other retail establishments, and dramatically changes state regulation of liquor distribution and sales." WASAVP, 174 Wn.2d at 666.

[11] Section 103(3)(b) provides in part:
License issuance and renewals are subject to RCW 66.24.010 and the regulations promulgated thereunder, including without limitation rights of cities…to object to or prevent issuance of local liquor licenses.

## 2. Motion To Strike City's Supplemental Standing Evidence

Before addressing the injury in fact test, we consider whether the trial court improperly excluded supplemental declarations submitted by the City to show standing. The City contends the trial court abused its discretion when it struck the supplemental declarations. The Board responds that the court never authorized supplemental facts. The parties agree that the trial court's ruling granting the Board's motion to strike is reviewed under an abuse of discretion standard.[12] "A trial court abuses its discretion when its exercise of discretion is manifestly unreasonable or based upon untenable grounds or reasons." Davis v. Globe Mach. Mfg. Co., 102 Wn.2d 68, 77, 684 P.2d 692 (1984).

A party seeking review of an agency action may submit additional evidence to demonstrate standing particularly where, as here, no hearing occurred at the administrative level. See Trades Council, 129 Wn.2d 798–99. Typically, judicial review of an agency action is limited to the administrative record. Because the City was not required to demonstrate standing for judicial review at the administrative level, and because the Board denied the City an adjudicative hearing, the administrative record is limited on evidence of standing. We conclude that the trial court should have considered the City's supplemental declarations, because the evidence went only to the question of standing for judicial review and not the merits. Nw. Envt'l Def. Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1528 (9th Cir.1997) ("Because Article III's standing requirement does not apply to agency proceedings, petitioners had no reason

---

[12] The parties' briefing at the trial court and on appeal discuss the application of RCW 34.05.562 governing new evidence taken by the trial court on the agency. We need not address whether that provision applies here.

-10-

to include facts sufficient to establish standing as a part of the administrative record. We therefore consider the affidavits not in order to supplement the administrative record on the merits, but rather to determine whether petitioners can satisfy a prerequisite to this court's jurisdiction.").

The record also shows that the trial court invited additional evidence on the standing issue. At the close of oral argument, the court specifically stated that the parties could "supplement the record on the issue of standing." RP (Jul. 19, 2013) at 40. The City then submitted declarations from three individuals supporting the inference that it would be injured if the minimart received a spirits license. The court struck the declarations and clarified it intended to request supplemental briefing only—not supplemental facts.

The City reasonably understood that the procedures followed in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130,119 L. Ed. 2d 351 (1992) and the court's comments allowed it to file the supplemental declarations. The City explained to the Court, "That's what we thought we were invited to do by the Court. And maybe I was mistaken, but that was my understanding. . . ."[W]e proceeded along with the outline that was laid out by Lujan." RP (Aug. 23, 2013) at 17-18. When the court asked the Board if it had a response to the City's argument on Lujan, the Board said, "I'm sorry, I don't at this time." RP (Aug. 23, 2013) at 20. The trial court acknowledged the confusion surrounding its request to "supplement the record":

> "And insomuch as the court may have caused any confusion, I apologize
> for that but it was never the intent....to allow supplemental declarations."

-11-

RP (Aug. 23, 2013) at 21. From our review of the record, we conclude that the trial court's invitation to "supplement the record" is ambiguous. We also note the absence of any prejudice to the parties arising from the City's submission of these declarations. Indeed, the record shows that the Board addressed the perceived deficiencies in the declarants' testimony at oral argument. In its briefing to the court, the Board had a full and fair opportunity to be heard with regard to these declarations. Yet, the court granted the motion to strike because the declarations were "too late."[13] RP (Aug. 23, 2013) at 23. Under the unique circumstances presented here, we conclude the trial court erred when it struck the City's declarations and declined to consider them.

Even if we ignore the supplemental declarations, the City's unique interest in protecting the safety and health of its citizens together with the Mayor's letter and the Board's enforcement officer statement are sufficient to satisfy the injury in fact test. We consider the supplemental declarations and the administrative record to determine whether the City demonstrated a sufficient injury in fact.

### 3. Injury in Fact

The parties' dispute here centers mainly on whether the City has shown injury in fact for standing. The Board contends the City's injury in fact evidence falls short because it "has to be concrete, in particular, actual or imminent, not conjectural or hypothetical..." to satisfy the injury in fact test. RP (Aug. 23, 2013) at 7- 8.

---

[13] The Board did not argue to the trial court that the declarations were irrelevant on the standing question or that the timing of these submissions caused it prejudice. Exclusion of evidence is undisputedly a harsh remedy, generally imposed as a sanction for the failure to comply with a court ordered deadline, willful violation of discovery order, or other similar conduct. None of the usual grounds for exclusion are present here.

To show an injury in fact, the City must demonstrate that it will be "specifically and perceptibly harmed" by the Board's action. Trepanier v. City of Everett, 64 Wn. App. 380, 382, 824 P.2d 524 (1992) (quoting Save a Valuable Env't v. City of Bothell, 89 Wn.2d 862, 866, 576 P.2d 401 (1978)). Where, as here, a party alleges a threatened injury, "as opposed to an existing injury," the party must prove that the threatened injury is "immediate, concrete, and specific." Trepanier, 64 Wn. App. at 383 (citing Roshan v. Smith, 615 F. Supp. 901, 905 (D.D.C. 1985)). Conjectural or hypothetical injuries are not sufficient for standing. Trepanier, 64 Wn. App. at 383 (citing United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 688–89, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973)).

The injury in fact test is not meant to be a demanding requirement.[14] Typically, if a litigant can show that a potential injury is real, that injury is sufficient for standing:

> It might be thought that the first condition is merely a *de minimis* rule: if substantial harm is not threatened, no important social purpose is served by review. But a judicial appraisal of the *extent* of harm is not contemplated. The requirement of harm is best thought of as one rational way to delimit the class of persons who can seek review. It is rational because it provides review for those close enough to the agency action to feel its impact in a tangible way and excludes those who are further removed. Thus, a person should be able to meet this condition if he or she can show that the potential injury is real, not that it is substantial. As the United States Supreme Court stated, an "identifiable trifle" should be sufficient.

Andersen, 64 WASH. L. REV. at 824 (quoting United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973)).[15]

---

[14] The trial court's oral ruling acknowledged that, "I do recognize, I don't think standing is a really high burden to meet."

The City has satisfied the injury in fact test for standing. The City demonstrated that minors regularly come into contact with the minimart and that criminal activity is common in the area. In its objection letter to the Board, the City claimed that licensing the minimart would be "incompatible with the land use in the area," AR at 39, noting crime near the location and the proximity to Burlington High School:

> [T]he proposed location is the site of numerous activities requiring law enforcement involvement. The Burlington Police Department has logged many calls to the proposed license location, reflecting the high level of crime that occurs at the licensee's business.
>     . . . . High-school aged children frequent this area . . . . Adding liquor to the products sold at this location will necessarily bring children into frequent close contact with those individuals who commit the crimes that plague the Skagit Big Mini Mart.

AR at 39.

The City's declarations also support the allegations in the Mayor's initial objection letter to the Board. Police Lieutenant Tom Moser notes that "[s]ince January 2009, Burlington police officers have responded to the address of the Skagit Big Mini Mart on 202 occasions," while the police responded to the former state liquor store only 22 times in between January 2009 and August 2011. CP at 157. Lieutenant Moser's declaration confirms the Mayor's assertion in his objection letter that the minimart "is the site of numerous activities requiring law enforcement involvement." AR 39.

City Planning Director Margaret Fleek provided a declaration emphasizing that, unlike the previous store location, minors frequent the minimart and the surrounding areas:

---

[15] But the United States Supreme Court has indicated that the injury in fact must not be too slight. Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S. Ct. 2130,119 L. Ed. 2d 351 (1992).

The site of the former store was not near any schools, playgrounds, or similar areas where children would congregate, and because of the proximity of the store to homes and dwellings, it would be unusual for children to pass by the former store on their way to school, parks, or other areas where children would be expected to frequent.

. . .The Mini-Mart site is located just over 500 feet from the property line of the Burlington-Edison High School, and a similar distance from numerous multi-family housing developments. Immediately adjacent to the convenience store is the Harry Ethington Memorial Park . . . .

The Mini-Mart is located between the multi-family developments and the High School. Youth who live in those dwelling units pass by the Mini-Mart often on their way to and from the High School. Youth also pause at the Harry Ethington Memorial Park on their way to and from school . . . .

CP at 160. Fleek also noted the correlation between alcohol advertising and underage drinking:

The City of Burlington does not regulate the content of advertising that businesses place in their storefront windows.

I am aware of numerous studies that have been conducted, which demonstrate the adverse effects alcohol advertising has on youth. For example, the Johns Hopkins University Bloomberg School of Public Health has identified 26 academic studies and papers as to the impacts of alcohol advertising on youth, leading the School to conclude that "research clearly indicates that alcohol advertising and marketing also have a significant effect by influencing youth and adult expectations and attitudes, and helping to create an environment that promotes underage drinking."

CP at 160–61.

Further, an email from the Board's own enforcement officer confirms that minors frequent the minimart, and the officer had knowledge that minors occasionally purchase alcohol there:

One of the Investigative Aids I work with . . . says he knows kids who buy alcohol there all the time.

I watched the store one afternoon and saw a stream of kids from the high school go into the store. I didn't see any come out with beer, but they all had back packs, and the bought or stolen beer could very easily been hidden in the back pack.

As a liquor officer and a parent I am concerned a spirits license for this premises is an invitation to add to the serious problem of youth access to alcohol.

AR at 41. Because of these concerns, Mayor Steve Sexton emphasized that the City will need to dedicate more law enforcement resources to monitor the minimart, impacting the City's budget:

Burlington currently employs 25 commissioned law enforcement officers, well short of the number of police officers that has been recommended for a city of our size. Any increase in workload for the City's police department impacts the City's ability to maintain public safety, and also has an impact on the City's budget. The relocation of the former state liquor store to the Skagit Big Mini Mart impacts the City's law enforcement resources, and the City's budget.

CP at 154.

The Mayor's objection letter, the enforcement officer's email to the Board, and the declarations submitted to the trial court demonstrate a probability that transferring the location of the spirits license from the original store to the minimart will harm the City. The record shows that, by moving the license from the old location to the minimart, the Board has placed a licensed liquor store at a location with more crime and a higher presence of minors. Reasonable minds might differ on whether the level of criminal activity constitutes "chronic illegal activity" for purposes of RCW 66.24.010. But we only need to address whether the City has demonstrated the minimal injury required to confer standing. The City has demonstrated a real injury that "is likely to [cause] prejudice." RCW 34.05.530. We do not examine the extent of the alleged harm. A party seeking standing need only demonstrate that the threatened injury is likely to occur, not that it is substantial. See Andersen, 64 WASH. L. REV. at 824. The record supports an inference that alcohol sales at the minimart are likely to impact school

-16-

children, coming and going from the nearby high school, the citizens who reside near the minimart, and the City's law enforcement resources and budget. Because the City will feel the impact of the Board's alleged illegal action in a tangible way, as this record demonstrates, it satisfies the test for standing to challenge the Board's decision.

Finally, our Supreme Court held that the threat to public safety posed by expanded liquor sales under I-1183 is a sufficient injury for standing. In Wash. Ass'n for Substance Abuse and Violence Prevention v. State, 174 Wn.2d 642, 278 P.3d 632 (2012), Washington Association for Substance Abuse and Violence Prevention (WASAVP)—a group dedicated to preventing substance abuse and violence— challenged the constitutionality of I-1183. WASAVP, 174 Wn.2d at 646. Though the appellants lost on the merits, the court concluded that the threat of expanded alcohol sales was a sufficient injury for standing.[16] The court applied the common law "zone of interest" and "injury in fact" standing test to find standing:

---

[16] WASAVP is a non APA case that involved standing under the uniform declaratory judgment act (UDJA) chapter 7.24 RCW. Nevertheless, WASAVP is controlling authority because the two-part standing test under the UDJA is nearly identical to the APA two-part standing test. See Suquamish, 92 Wn. App at 829 (LUPA standing and APA standing nearly identical because the prejudice prongs of the two standing tests are substantially identical. Both prongs require injury in fact.) In order to establish a justiciable controversy based on harm, the APA and UDJA standing test both require a litigant to satisfy the same two-part test–"zone of interest" and "injury in fact". In addition, "The principles stated in the APA were not novel, but represented the state and federal common law of standing as of the date of the [APA's] passage….that common law has continued to evolve, but the Washington APA provisions on standing are still consistent with general standing law." William R. Andersen, *Judicial Review of Administrative Procedure Act Decisions, in* Wash. State Bar Ass'n, Washington Administrative Law Practice Manual § 10.02[C] (Richard Heath et al. eds., 2008).

The legislature has directed that "courts should interpret provisions of this chapter consistently with decisions of other courts interpreting similar provisions of …the federal government…." Seattle Bldg of Const. Trades Council v. Apprenticeship of Training Counsel, 129 Wn.2d 787, 794, 920 P2d 581(1996) citing RCW 34.05.001.

72438-0-I/18

Appellants appear to have interests that are regulated by I-1183. WASAVP's goal of preventing substance abuse and violence places it within the zone of interests of I-1183, which broadly impacts the State's regulation of alcohol. . . .I-1183 removes the State from the business of running liquor stores.

[WASAVP has] established injury in fact. Although WASAVP has not suffered economic loss as a result of I-1183, its goals of preventing substance abuse could reasonably be impacted by I-1183's restructuring of Washington's regulation of liquor. Indeed, [WASAVP] stress[es] the established relationship between public safety and liquor, . . . such that the increase in liquor availability would injure WASAVP's goals.

WASAVP, 174 Wn.2d at 653–54 (emphasis added). The City's injury here stems from

the same relationship between public safety and liquor discussed in WASAVP. Like in

WASAVP, the issuance of a liquor license to the minimart presents a public safety

concern for Burlington residents—a concern recognized by the City and the Board's

own enforcement agent. To prove standing, the City does not have to prove a history of

violations or increased criminal or other specific unlawful conduct that go to show why

the minimart location is ill-suited for that area. It is enough for the City to show a

potential threat to public safety and its interest in public safety. WASAVP, 174 Wn.2d at

653–54.

Further, if the City succeeds on the merits, a court order reversing the Board's

issuance of the minimart's liquor license would remedy this injury. RCW 34.05.530(3).

---

"[T]he APA standing test was intended to codify some basic principles derived from standing case law." Suquamish Indian Tribe v. Kitsap County, 92 Wn. App 816, 829, 965 P.2d 636 (1998).

We also note that § 302 of I-1183 mandates that a portion of the liquor revolving fund associated with the state's collection of liquor licensing fees be provided to "...cities... for the purpose of enhancing public safety programs." It was this compelling interest that prompted city and county government officials to file amici briefs expressing their interest in the implementation of I-1183 in their communities, and in particular, the allocation of liquor-related revenue for public safety purposes. WASAVP, 174 Wn.2d at 652.

-18-

The City presents a discrete, narrow legal question regarding whether the Board exceeded its authority under the plain language of the statute when it issued the license to the minimart. Such a straightforward issue of statutory interpretation is well within the province of the courts, and a determination on the merits would either confirm the City's allegation that the minimart was granted a license illegally—in which case the threat to public safety would be removed—or affirm the Board's authority to grant and transfer licenses obtained via public auction. Courts regularly grant standing to parties, like the City, that present well-defined legal questions with clearly available remedies:

> [C]ourts are most likely to examine narrowly drawn challenges to the legality of agency action at the instance of parties who have suffered injury in a setting which bespeaks injustice. Similarly, courts are less likely to reach unfocused, peripheral or fact-dependent questions at the instance of those whose injuries are slight or whose claim to justice is marginal.

Andersen, 64 WASH. L. REV. at 824-25. Here, the City's claim is not "unfocused, peripheral or fact-dependent," but instead presents a narrowly drawn legal issue with an available remedy. To deny the City an opportunity to address this discrete statutory question based on a rigid application of the standing requirements would be to ignore a real threat to public safety and frustrate the purpose of the statute. RCW 66.08.010.

The question of the Board's alleged illegal action would also evade judicial review to the detriment of the City's interest in the safety of its residents.

We note that Professor Andersen emphasized the vital function performed by judicial review of agency action:

> [T]o keep administrative agencies within the bounds set for them by legislative and constitutional command. During judicial review courts support the legislative process by insisting that legislatively prescribed boundaries of agency action are respected. Courts also may be enforcing

any constitutional limits the people thought wise to impose on agencies or legislatures.

Agencies benefit from judicial review. Courts can support vigorous agency action with statutory clarification. Courts sometimes can insulate agencies from wrongful pressure from other public or private actors. In a broader sense, judicial review confers legitimacy on the administrative process, in essence, certifying that the agency action is legislatively authorized, and hence is democratically accountable.[17]

Andersen, 64 WASH. L. REV. at 820.

Under the circumstances here, we conclude the City has demonstrated standing to challenge the Board's issuance of a liquor license.[18]

### The City's Remaining Claims

The City raises several other arguments related to standing.[19] The City also claims the Board violated its procedural and constitutional rights.[20] Given our disposition of the standing question, we need not address the City's remaining claims.

---

[17] There is no doubt that the City's legal challenge to the Board's action raises a significant question of public importance about the Board's authority to grant relocation of a liquor license under I-1183.

[18] The Board relies on Patterson for the proposition that "[a] party's standing to participate in an administrative proceeding, however, is not necessarily coextensive with standing to challenge an administrative decision in a court." Patterson, 171 Wn. App. at 257. We agree. Any party appealing an administrative action must satisfy the standing requirements under RCW 34.05.530. And in that case, the litigant who might have had standing gave it up by settling and withdrawing review of the aggrieving issue.

[19] The City contends it has standing because (1) as a general purpose local government with police powers, it does not need to meet the normal redressability and immediacy requirements of the injury in fact test, (2) it was party to the administrative proceedings, (3) it has associational standing to challenge the Board's action, and (4) the agency's failure to provide a hearing is sufficient to satisfy the injury in fact test.

[20] The City contends (1) that the Board violated its constitutional right to procedural due process by denying a hearing, (2) that denying a hearing was arbitrary and capricious, (3) that the Board failed to raise standing during the administrative proceedings and therefore may not raise the issue on appeal, (4) that the Board failed to provide notice regarding the adjacent park, (5) that the Board failed to give "due consideration" to the location of the minimart as required by RCW 66.24.010 (9)(a)(i), and (6) that the Board failed to give the City's objections proper weight.

## CONCLUSION

We conclude the City has standing to seek judicial review of the Board's decision to allow transfer of a liquor license from the location of a former state-run liquor store. Accordingly, we reverse and remand to the superior court for further proceedings consistent with this opinion.[21]

_____

WE CONCUR:

Trickey, J.                                    Becker, J.

_____

[21] We also note that before ruling on the standing question, the trial court explained that without a finding of standing, it could not reach the merits of the City's assertions about the Board's actions. Nevertheless, the trial court determined in its oral ruling that the Board's license relocation decision was erroneous:

> And I want to talk about the main issue...whether or not the Washington State Liquor Control Board had the authority to allow a former state-run liquor store to relocate. And I find that it did not have the authority. . . .If I were to get to a final ruling, I would find that the Board acted outside its statutory authority. I would find that they erroneously interpreted and applied the law...And I can't make any rulings on the merits unless I find that there is standing. RP (Aug. 23, 2013) at 29 and 32 (emphasis added).

The court concluded by denying the City standing for judicial review. This record is clear. The trial court did not make a final decision on the Board's liquor license relocation decision, nor could it when it found no standing.