**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 11, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 11, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| BENTON COUNTY WATER CONSERVANCY BOARD, | NO. 101838-0 |
| Petitioner, | EN BANC |
| v. | |
| WASHINGTON STATE DEPARTMENT OF ECOLOGY, | Filed: April 11, 2024 |
| Respondent. | |

STEPHENS, J.— While the Department of Ecology (Department) principally manages our state's water resources, county water conservancy boards hold largely coextensive authority with the Department to process voluntary water right transfers between water right holders. This case focuses on the relationship between the Department and the Benton County Water Conservancy Board (Board) and requires us to determine whether the Board has standing under the Administrative Procedure Act (APA), ch. 34.05 RCW, to challenge a department policy concerning certain water right transfers.

We hold that the Board lacks standing to challenge Department Policy 1070, used to administratively confirm the division of a water right between multiple

property owners who own land to which the water right is appurtenant. The Board

has not demonstrated how it suffered injury-in-fact from the Department's refusal to

accept certain administrative division forms pursuant to the policy. The Board

suffered no prejudice and its interests would not be redressed by invalidating the

policy. Accordingly, we affirm the Court of Appeals.

BACKGROUND FACTS AND PROCEDURAL HISTORY

The Department manages Washington's water resources, in part, by

processing water right transfers between water right holders. *See* RCW

90.03.380(1), .255. Water conservancy boards are county specific, independent,

public entities, statutorily authorized to help "expedit[e] voluntary water [right]

transfers." RCW 90.80.005(3), .020(1), .060(2). Boards hold largely the same

authority as the Department to review water right transfer applications, subject to

the Department's mandatory oversight. RCW 90.80.055(1), (2), .080(4). The

Department's review of board actions is appealable to the Pollution Control

Hearings Board. RCW 90.80.090; WAC 173-153-180.

RCW 90.03.380 permits water right transfers so long as "such change results

in no increase in the annual consumptive quantity of water used under the water

right," also known as historic beneficial use. To effectuate a transfer, a water right

holder must file a change application with the Department. *Id.* This process requires public notice before the Department can grant the requested change. *Id.*

The Department also administers the state's trust water rights program. RCW 90.14.140(2)(h). Water right holders may either temporarily or permanently transfer their water rights to the State for the state's beneficial use. RCW 90.42.040(1), .080(1). The transfer of water rights into the trust program is necessarily independent of any transfer of land.

RCW 90.54.030(1)-(2) requires the Department to "[d]evelop a comprehensive water resource data program" including "an information management plan" and to "[c]ollect, organize[,] and catalog existing information and studies" about water resources in the state. The statute does not mandate that the Department record water right ownership information. Pursuant to RCW 90.54.030, the Department maintains information about all water right transfers, including those put into the trust program, in its water right tracking system.

When a water right is appurtenant to land shared by multiple property owners, the property owners may ask the Department to administratively confirm the division of the water right. The Department uses Policy 1070, titled "Administrative Policy for Recording the Agreed Division of Water Rights Among Multiple Property Owners," to track the division of a water right in these circumstances. Clerk's Papers

(CP) at 16. The result is a "superseding document describing [each property owner's] share of the original water right." *Id.* at 17. Policy 1070 does not "convey any ownership rights outside of what is agreed to by" the property owners of the land. *Id.* at 22. It merely "clarif[ies] the apportioning of [the water] right[] as agreed to by all the property owners." *Id.* at 17.

The dispute at the heart of this case is evidenced by two administrative division requests. In 2015, Plymouth Ranch LLC placed portions of its water rights into the state's trust program. Plymouth thereafter sold some of the land but retained the water rights. In 2020, Plymouth placed additional water rights into the trust program. In 2021, Plymouth sold a portion of the water rights in trust to Frank Tiegs LLC.

On Plymouth's and Tiegs's behalf, the Board filed an administrative division confirmation request under Policy 1070 with the Department. The Department rejected the request, citing "several technical deficiencies," including that (1) Tiegs did not own any land to which the water rights were appurtenant, (2) the division request listed incorrect parcel numbers, and (3) the division request lacked the signatures of three other property owners who owned the land to which the water rights were appurtenant. Dep't's Opening Br. at 12 (Wash. Ct. App. No. 38803-4-III (2022)). The Department claimed it did not deny the application because the

water rights at issue were held in trust. To complete the water right transfer to Tiegs, the Department recommended the parties follow the public notice process in RCW 90.03.380. The Department also noted it was "unusual and outside the scope of a County Water Conservancy Board to file these administrative documents on behalf of applicants." CP at 32. Plymouth and Tiegs chose not to appeal the Department's decision. Tiegs instead filed a new application with the Board pursuant to the recommended process set out in RCW 90.03.380.

In a prior instance in 2012, the Department denied an administrative division request filed by the Board for T&R Farms Inc. on the ground that the request violated RCW 90.03.380.[1] The Board filed a writ of mandamus in superior court in 2013. Finding that the Department's role in processing the division of water rights was merely ministerial, the court required the Department to accept the administrative division. The Department did not appeal. The 2012 request did not reference whether water rights had been placed in the trust program.

In 2021, the Board sought judicial review of what it described as the Department's categorical "refusal . . . to administratively confirm division of water rights 'parked' in . . . [the] trust water program." *Id*. at 1, 3. Referring to its

---

[1] The Department explained that its denial of the T&R Farms division request was because the request increased acreage from the original water right, thereby increasing the consumptive use of the water right.

disagreements with the Department with respect to the T&R Farms and Plymouth/Tiegs division requests, the Board claimed the Department's "ongoing refusal to administratively confirm changes in water rights ownership [was] arbitrary and capricious, . . . causing . . . injury to the Board's performance of its statutory duties and to water rights holders of Benton County." *Id.* at 7. The superior court granted judicial review and the Board moved for summary judgment, seeking to enjoin the Department from declining the Board's administrative division requests.

The Board filed a declaration by its chair, Darryll Olsen, in support of its motion. The declaration states that the Department's actions "threaten[] to frustrate the orderly changes and transfers of water rights by voluntary changes in ownership among those appearing before [the Board]." *Id.* at 176. According to Olsen, it is "ordinary practice" for a water right conveyance to "remove[] appurtenancy to land," and applicants of such transfers often "seek an order from the Board approving use of the water right somewhere else." *Id.* at 176-77. He states that "[t]he most common type of application received by the Board" is that at issue in the Plymouth/Tiegs case, when a water right holder wants to "sell a portion of the water right to a new owner," and that these applications are "typically accompanied with or preceded by the filing" of an administrative division request with the Department. *Id.* at 177. The Department then inputs information from accepted administrative

divisions into its water right tracking system, which the Board uses and relies on to "confirm water right ownership before accepting applications to change or transfer the use of the water right pursuant to RCW 90.03.380." *Id.* at 177-78, 230. Therefore, Olsen claims, the Department's ongoing "refusal to record certain ownership changes in the System interferes with the [Board]'s processing of such applications, because the Board cannot process change/transfers that lack clear ownership information." *Id.* at 178-79.

At the summary judgment hearing, the Department argued that the Board lacked standing because it failed to prove injury-in-fact. The Department explained it had denied the Plymouth/Tiegs request because of "factual problems with th[e] document that [the parties] could fix and . . . file . . . again." Hr'g at 34. The superior court disagreed, granting summary judgment to the Board and directing the Department to accept administrative division requests from the Board.

The Court of Appeals reversed and held the Board lacked standing to challenge the Department's action. *Benton County Water Conservancy Bd. v. Dep't of Ecology*, 25 Wn. App. 2d 717, 726, 524 P.3d 1075 (2023). The court held that the Board's arguments were grounded in a "mischaracterization" of Policy 1070, rejecting the claim that the Department meant for the policy to operate as a ministerial process, similar to a quitclaim deed, for water rights interests. *Id.* at 725.

7

The court acknowledged that RCW 90.03.380's transfer application process was "more cumbersome" than Policy 1070, nonetheless holding that the Board's claimed injury "amount[ed] to nothing more than conjecture." *Id.* at 725-26. The court dismissed the petition for judicial review under RCW 34.05.530 for lack of standing. *Id.* The Board appealed, and we granted review.

Before this court, the Board argues the Department's application of Policy 1070 demonstrates an ongoing "refusal to recognize ownership changes for water rights placed in trust" and for water rights "no longer appurtenant to land." Pet. for Rev. at 2, 13; Bd.'s Suppl. Br. at 1, 14-15. The Department's denials of administrative division requests in this context, the Board argues, unnecessarily require the Board to follow RCW 90.03.380's public notice process for water right transfers, inflicting "costs and delay[s]" and an "'informational injury' . . . from the 'degradation of data' in the Water Rights Tracking System." Bd.'s Suppl. Br. at 21. The Board also argues its interests fall within the zone of interest affected by the Department's decision as "[a] governmental agency charged to implement the Water Code." *Id.* at 27.

## ANALYSIS

The sole issue before us is standing. "Standing generally refers to a particular party's right to bring a legal claim." *Wash. State Hous. Fin. Comm'n v. Nat'l*

*Homebuyers Fund, Inc.*, 193 Wn.2d 704, 711, 445 P.3d 533 (2019). The party

seeking review bears the burden to prove standing. *Sarepta Therapeutics, Inc. v.*

*Wash. State Health Care Auth.*, 19 Wn. App. 2d 538, 549, 497 P.3d 454 (2021),

*review denied*, 200 Wn.2d 1030 (2023). We review issues of standing de novo. *In*

*re Est. of Becker*, 177 Wn.2d 242, 246, 298 P.3d 720 (2013).

Under the APA, a party has standing to challenge an agency action if it has

been "aggrieved or adversely affected by the agency action." RCW 34.05.530. To

be aggrieved or adversely affected, the party must meet all three following

conditions:

> (1) The agency action has prejudiced or is likely to prejudice
> that person;

> (2) That person's asserted interests are among those that the
> agency was required to consider when it engaged in the agency action
> challenged; and

> (3) A judgment in favor of that person would substantially
> eliminate or redress the prejudice to that person caused or likely to be
> caused by the agency action.

*Id.* Our test often tracks federal standing rules. *Allan v. Univ. of Wash.*, 140 Wn.2d

323, 327, 997 P.2d 360 (2000). The first and third prongs are considered "injury-in-

fact" requirements and the second prong is the "zone of interest" test. *Id.*

Injury-in-Fact

As noted, injury-in-fact addresses prejudice and the redressability of the alleged harm. It "serves to distinguish a person with a direct stake in the outcome of a litigation . . . from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973) (*SCRAP*). In the past, the Supreme Court has suggested a lenient standard for the injury-in-fact requirement such that "'an identifiable trifle [of injury-in-fact] is enough for standing.'" *Id.* (quoting Kenneth Culp Davis, *Standing: Taxpayers and Others*, 35 U. CHI. L. REV. 601, 613 (1968)). But the Court "left the viability of *SCRAP*'s commentary on standing doubtful" in *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). *Allan*, 140 Wn.2d at 327-28. In that case, the Court stated *SCRAP*'s "expansive expression of what would suffice for . . . review [pursuant to the federal APA] under its particular facts has never since been emulated by th[e] Court." *Nat'l Wildlife Fed'n*, 497 U.S. at 889. Later, in *Lujan v. Defenders of Wildlife*, the Court clarified that "[s]tanding is not 'an ingenious academic exercise in the conceivable,' but . . . requires, at the summary judgment stage, a factual showing of perceptible harm." 504 U.S. 555, 566, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (citation omitted) (quoting *SCRAP*, 412 U.S. at 688). This standard

guides our analysis of injury-in-fact under our APA. *See Allan*, 140 Wn.2d at 329 (though the petitioner tried to distinguish *Defenders*, 504 U.S. 555, it was "still applicable to her case").

Under this test, the Board fails to prove an injury-in-fact. Misunderstanding the application of Policy 1070 and its role in processing administrative divisions, the Board claims prejudice based on a nonexistent injury. For similar reasons, the Board also fails the redressability prong of the standing test.

*Prejudice*

Prejudice is a principal focus of the injury-in-fact inquiry. To prove prejudice, the party seeking review must demonstrate how the agency action caused specific and perceptible injury to a legally protected interest. *Sarepta*, 19 Wn. App. 2d at 550; *Freedom Found. ex rel. State v. Bethel Sch. Dist.*, 14 Wn. App. 2d 75, 86, 469 P.3d 364 (2020), *review denied*, 196 Wn.2d 1033 (2021). But the test "'requires more than an injury to a cognizable interest. It requires that the party seeking review be . . . among the injured.'" *Allan*, 140 Wn.2d at 328 (emphasis omitted) (alteration in original) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734-35, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972)).

The "mere fact that an unfavorable result could become precedent to [the party's] potential future litigation" is not sufficient injury-in-fact to a cognizable interest. *Freedom Found.*, 14 Wn. App. 2d at 89-90. Applying settled principles, the Court of Appeals in *Freedom Foundation* held that Freedom Foundation did not have standing to challenge the Public Disclosure Commission's dismissal of a complaint filed by the foundation against a school district. *Id.* at 79. The foundation argued the commission's decision would be "'wielded against the Foundation when it later [sought] to initiate . . . complaints based upon similar conduct,'" "'frustrat[ing] the Foundation in achieving its goal to promote the policies embodied in the [Fair Campaign Practices Act].'" *Id.* at 88 (quoting briefs).[2] The court ruled, however, that the foundation had not identified any "direct economic effect or material adverse injury" or "any specific or perceptible harm." *Id.* at 89. The Board's allegations here are similar in that they assert no interest in the outcome of specific administrative division requests but, instead, seek to enjoin the Department from denying requests involving water rights that have been placed in the State's trust program. CP at 9.

---

[2] In its briefing, the Freedom Foundation described itself as a nonprofit organization that seeks to educate public employees about their rights regarding union representation, membership, and dues payment.

"Where 'a party alleges a threatened injury, as opposed to an existing injury, the party must prove that the threatened injury is immediate, concrete, and specific.'" *Sarepta*, 19 Wn. App. 2d at 550 (internal quotation marks omitted) (quoting *City of Burlington v. Wash. State Liquor Control Bd.*, 187 Wn. App. 853, 869, 351 P.3d 875, *review denied*, 184 Wn.2d 1014 (2015)).  Conjectural or hypothetical injuries do not suffice. *Id.; see Nat'l Homebuyers*, 193 Wn.2d at 716 (the injury-in-fact test "precludes those whose injury is speculative or abstract, rather than actual, from bringing an action").

This standard was met in *Burlington*, where the Court of Appeals recognized the city of Burlington had standing to challenge the Washington State Liquor Control Board's decision to allow the relocation of an individual's liquor license.  187 Wn. App. at 858.  Declarations from law enforcement and the city planning director, an objection letter from the mayor, and an e-mail from the Liquor Board's enforcement officer indicated a likelihood of harm to the city that would be caused by "transferring the location of the spirits license . . . [to] a location with more crime and a higher presence of minors." *Id.* at 872.  Because the record demonstrated the city would "feel the impact of the [Liquor Control] Board's . . . action in a tangible way," the city met the injury-in-fact requirement. *Id.* at 872-73.

While this court may recognize standing for claims of injunctive relief on broader grounds than the Supreme Court, we have held that past conduct alone can be insufficient "'if unaccompanied by any continuing, present adverse effects.'" *Allan*, 140 Wn.2d at 329 (quoting *Defenders of Wildlife*, 504 U.S. at 564. In *Allan*, this court held that the spouse of a professor subject to academic discipline lacked standing to challenge amendments to the University of Washington's faculty code. *Id.* at 332. Though she claimed harm by way of her participation in the adjudicative proceedings against her husband, this past individual harm alone was insufficient to constitute present injury-in-fact. *Id.* at 329.

Similarly, in *Patterson v. Segale*, the Court of Appeals concluded that a claim of future harm alone did not confer standing on the petitioners. 171 Wn. App. 251, 259-60, 298 P.3d 657 (2012). The petitioners challenged the city of Burien's decision to approve the construction of a rock partition on the Puget Sound shoreline pursuant to King County's shoreline management plan. *Id.* at 255, 260. The Shorelines Hearings Board affirmed the city's decision. *Id.* at 254. Soon after the appeal was filed, however, the petitioners agreed to settle with the builder of the partition. *Id.* at 256. Nonetheless, the petitioners continued their appeal, asserting in part "that they may be harmed by a future permitting decision in which the [c]ity utilizes the King County" shoreline management plan. *Id.* at 256-57, 259. The court

concluded this "nonspecific and conjectural injury" did not "satisfy the prejudice requirement of the injury-in-fact test," as the petitioners were "no differently situated than . . . any other members of the public." *Id.* at 259-60.

The Board's complaint in this case is similarly nonspecific and requires conjecture. Though the Plymouth/Tiegs division request triggered its petition for judicial review, the Board maintains this case is not about their specific water rights but the Department's "ongoing" application of Policy 1070. Hr'g at 40; Pet'r's Suppl. Br. at 21. The stated context of this ongoing application of the policy does not appear connected to the instances the Board highlights. *See* Pet'r's Suppl. Br. at 1 (citing the Plymouth/Tiegs request as evidence of the Department's "categorical refusal to . . . record changes in water right ownership where the water right [is] not appurtenant to land"). [3] In effect, the Board asserts that if the Department continues denying administrative division requests as it has in the past, this alleged practice

---

[3] At times, the Board characterizes the Department's actions as the "categorical refusal to recognize ownership changes for *trusted rights* no longer appurtenant to land." Pet'r's Suppl. Br. at 24 (emphasis added); *see* CP at 1 (the Board's original petition for judicial review before the Benton County Superior Court challenged the Department's "refusal . . . to administratively confirm division of water rights 'parked' in [the Department]'s trust water program"). We recognize that water rights placed in trust, as at issue in the Plymouth/Tiegs request, are no longer appurtenant to land. As for the T&R Farms division request, this seems to have involved the sale of water rights independent of any land, and the record does not demonstrate that those water rights were in trust. The Department's denial stated that the T&R Farms request would have expanded the acreage of the original water right in violation of RCW 90.03.380.

threatens to interfere with the Board's statutory functions and will hinder water right transfers. The Board claims the Court of Appeals' statement that RCW 90.03.380 is "'more cumbersome'" than Policy 1070 is an acknowledgement of the "ongoing interference with the Benton Board's authority." *Id.* at 21 (emphasis omitted); *Benton*, 25 Wn. App. 2d at 726.

The Board appears correct that in the Plymouth/Tiegs case, the Department denied the division request in part because Tiegs did not own land to which the transferred water right was appurtenant. This decision, however, does not demonstrate a "categorical refusal" to acknowledge water right transfers independent of land. Pet'r's Suppl. Br. at 24. Rather, it illustrates the limited purpose of the policy, which does not apply in such instances. The Department has made clear that an administrative division request under Policy 1070 does not transfer water rights or convey any ownership interest at all but is merely a means of apportioning a water right appurtenant to land that is owned by multiple property owners. Stated differently, the policy does not apply to the transfer of a water right to a nonowner of the property. When Plymouth sought to transfer a portion of its water rights to Tiegs independent of any land transfer, the Department directed the parties to follow the statutory process provided in RCW 90.03.380. And, Plymouth

and Tiegs did so.[4] The Court of Appeals was correct in concluding that the Board's arguments "stem from a mischaracterization of [Policy 1070]" for water rights interests." *Benton*, 25 Wn. App. 2d at 725.

To the extent the Board anticipates future disagreements with the Department with respect to allowing the administrative division of water rights in the trust program or water transfers independent of land, these potential disagreements do not show a "'present case or controversy.'" *Allan*, 140 Wn.2d at 329 (internal quotation marks omitted) (quoting *Defenders of Wildlife*, 505 U.S. at 564). The Court of Appeals correctly concluded that the Board has failed to demonstrate any injury-in-fact. *Benton*, 25 Wn. App. 2d at 726.

Further, the Board's claimed harm is not a "specific and perceptible . . . invasion of a legally protected interest." *Sarepta*, 19 Wn. App. 2d at 550. The Board has no statutory interest in processing administrative divisions in the circumstances pursuant to Policy 1070, and it appears to be mistaken about its role in filing the Plymouth/Tiegs request with the Department. As noted, the Board's interest in processing the Plymouth/Tiegs request is somewhat analogous to the situation in *Freedom Foundation*. When it filed the request on the parties' behalf with the

---

[4] The record does not reflect the current status of that statutory proceeding, only that Tiegs filed public notice of the water right transfer.

17

Department, the Board was not acting pursuant to its coextensive statutory authority with the Department but, instead, pursuing the administrative division on Plymouth's and Tiegs's behalf. It was essentially acting as the parties' agent. *See* CP at 32 (the Department observed it was unusual for the Board to file these administrative documents on behalf of the parties). Though the Board is statutorily authorized to process certain water right transfers, here, the Board did not attempt to do so and its petition for judicial review merely asserts that the Department policy frustrates its nonstatutory goals.

Similar to the *Patterson* petitioners' settlement decision, Plymouth and Tiegs chose not to appeal the Department's denial and instead have pursued the public notice process in RCW 90.03.380. When the water right holders themselves do not find it necessary to appeal to protect their interests, it is difficult to conclude the Board, as their agent, "feel[s] the impact of the [Department's] . . . action in a tangible way." *Burlington*, 187 Wn. App. at 872-73.

Additionally, the Board inadequately explains how it, or water right holders, are prejudiced by the Department's requirement that they directly follow RCW 90.03.380. The Board acknowledges that when parties seek a water right transfer via Policy 1070, the parties must still subsequently engage in RCW 90.03.380's "further proceedings concerning use of the water, as historical beneficial use must

support the quantities claimed." Pet'r's Suppl. Br. at 4; *see also* Wash. Sup. Ct. oral arg*., Benton County Water Conservancy Bd. v. Dep't of Ecology*, No. 101838-0 (Jan. 23, 2024), at 40 min., 9 sec. to 40 min., 55 sec. (after the sale of a trust water right, "the regulation of the use . . . of that trust water [right] . . . goes through the full [RCW] 90.03.380 process"), *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. It is difficult to see how concrete harm results from requiring a statutory process the petitioning parties must nevertheless pursue even after filing an administrative division request in order to confirm the historic beneficial use of the water right.

As a separate basis for standing, the Board asserts the Department's actions will degrade the quality of data in the water right tracking system, inflicting an "informational injury" on the Board. Pet'r's Suppl. Br. at 20-21 (citing *Nat'l Urban League v. Ross*, 489 F. Supp. 3d 939, 967 (N.D. Cal. 2020)). Initially, even if it costs time and money to require *parties* to follow RCW 90.03.380, doing so has no effect whatsoever on the *Board's* functions because it has no statutory or regulatory role in processing administrative divisions under Policy 1070. In contrast to the census data at issue in *National Urban League*, the Department is not statutorily required to record water right ownership. And, as the Department points out, it often does not receive notice when perfected rights are conveyed with property to which they are

appurtenant. Moreover, the Board has not alleged that the Department fails to accurately record water transfer information when the applicants follow the process in RCW 90.03.380. We hold the Board has failed to prove it suffered prejudice from the Department's actions.

Relatedly, the Board cites to *National Homebuyers Fund* in support of its claim that as a public entity, it has an interest against "interference with [its] governmental processes." Pet'r's Suppl. Br. at 21-22. That case recognized that "a party that has been delegated the authority to act in a governmental capacity in a particular area has an interest against interference from others who purport to exercise similar governmental authority *without authorization*." *Nat'l Homebuyers Fund*, 193 Wn.2d at 713 (emphasis added). *National Homebuyers Fund* does not help the Board's argument because the Department, whose "interference" the Board complains of, is authorized expressly by statute to manage water right transfers. *See* RCW 90.03.380(1) (written applications for water right transfers or changes shall be filed with the Department). More specifically with respect to Policy 1070, the Department is also authorized to process administrative divisions of water rights.

The Board also asserts it suffered a "procedural injury through . . . [the] implementation of an illegal rule" because the Department "fail[ed] to engage in required rulemaking procedures when devising the policies and procedures" at issue

20

here. Pet'r's Suppl. Br. at 24-25. We have recognized that "'procedural rights are special: [t]he person who has been accorded a procedural right to protect [their] concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.'" *Allan*, 140 Wn.2d at 330 (internal quotation marks and emphasis omitted) (quoting *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 794-95, 920 P.2d 581 (1996)). However, a "'concrete interest'" remains "essential to the assertion of 'such procedural rights.'" *Id.* Without a showing of a concrete injury-in-fact, the Board cannot claim standing on the basis of its alleged procedural injury. *Id.* Here, the Board cannot establish any injury-in-fact with respect to Policy 1070 because water conservancy boards do not engage in the administrative division of water rights pursuant to that rule. The Board does not demonstrate the Department's actions entail a "specific and perceptible . . . invasion of a legally protected interest." *Sarepta*, 19 Wn. App. 2d at 550.

Finally, citing to *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977), the Board contends it has associational standing to bring this suit on behalf of the county's individual water right holders. Pet'r's Suppl. Br. at 25-26 & n.3. It argues individual water right holders "concerned with a single transaction cannot reasonably be expected to . . .

21

invest[] . . . [the] time and money required to correct [the Department]'s systematic errors" in administering the water code. *Id.* at 26. This argument misunderstands the Board's relationship with water right holders in its geographical area. The Board is not an organization that individuals join as members; the Board is a "unit of local government in the state" that exercises coextensive authority with the Department to process certain individual water right transfer applications. RCW 90.80.050-.055, .070. It necessarily maintains separation from individual water right holders given its function in issuing decisions on certain transfer requests. RCW 90.80.120 ("Conflicts of interest"). Though the Board filed the administrative division requests under Policy 1070 on behalf of T&R Farms and Plymouth and Tiegs, under chapter 90.80 RCW, the Board holds no formal "agency" relationship with water right holders in its geographical area. We do not recognize associational standing in this circumstance.

*Redressability*

To adequately prove injury-in-fact, the party seeking review must prove, in addition to prejudice, that a judgment in their favor "would substantially eliminate or redress the prejudice . . . caused or likely to be caused by the agency action." RCW 34.05.530(3).

The redressability of the prejudice must be "'likely, as opposed to merely speculative.'" *KS Tacoma Holdings, LLC v. Shorelines Hr'gs Bd.*, 166 Wn. App. 117, 129, 272 P.3d 876 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)), *review denied*, 174 Wn.2d 1007 (2012). Redressability is more difficult to show when the "government action . . . being challenged is directed at a third party rather than the party asserting injury." *Id.* at 136. In such cases, redressability "'ordinarily hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.'" *Id.* (quoting *Defenders*, 504 U.S. at 562).

In *KS Tacoma Holdings*, for example, the Court of Appeals concluded the petitioner failed to meet the redressability requirement. *Id.* at 135-37. Alleging injuries to the "recreation, view, and aesthetic interests . . . experienced by third parties," the petitioner challenged the city of Tacoma's issuance of a permit revision to another developer. *Id.* at 122-24. The court wrote that even if the permit revision was voided, the developer would "remain free to finish its project with its choice of aesthetic design, not one guaranteed to please [the petitioner]." *Id.* at 135. Additionally, the petitioner did not meet the "admittedly difficult task of demonstrating or putting forth material issues of fact showing that [the other

23

developer] or the [c]ity would make future choices" redressing the petitioner's alleged injuries. *Id.* at 137. Similarly, the petitioners in *Patterson* did not meet the redressability requirement because the partition they complained of had already "been constructed and [would] remain in place regardless" of the decision on appeal. 171 Wn. App. at 260.

As in those cases, the Board cannot show redressability of harm. The Board states that "enjoining [the Department] from refusing to accept and record ownership changes for trusted rights" would fully redress its injuries. Pet'r's Suppl. Br. at 17. But, the parties affected by the Department's refusal to accept their administrative division form subsequently pursued the available statutory process, and the Department correctly points out there is no evidence in the record they would "revive their administrative division requests if the [c]ourt were to rule in the Board's favor." Suppl. Br. of Resp't at 22. The Board fails to meet the redressability prong of the injury-in-fact requirement.

At bottom, the Board's interests are indirect with respect to the Plymouth/Tiegs matter and inchoate with respect to the Board's assertion that the Department categorically refuses to process certain types of division requests. Certainly, the Department's actions may affect the Board's ability to process administrative division requests, but the Board misunderstands its role in that limited

context. Policy 1070 is directed toward water right holders, not the Board. Thus, redressability depends on the actions of the water right holders. *See KS Tacoma Holdings*, 166 Wn. App. at 129 (when the challenged government action regulates a third party, redressability depends on the response of that third party). The Board has no role in processing administrative division requests under Policy 1070, so an injunction is irrelevant to the Board's function of assisting with water right transfers. Similar to the settlement in *Patterson*, Plymouth and Tiegs did not appeal the denial of their division request. Rather, as the Board itself acknowledges, Tiegs chose to file a water right change application pursuant to the public notice requirement in RCW 90.03.380. The Board's challenge would invite us to speculate whether water right holders are more likely to file administrative division requests pursuant to Policy 1070 if the injunction holds. We decline to do so and hold that the Board fails to establish injury-in-fact under the APA standing test.

Zone of Interest

The second prong of the standing test is the zone of interest requirement. *See* s*upra* at 8-9. A party comes within the zone of interest to challenge an agency action if the "Legislature intended the agency to protect the party's interests when taking the action at issue." *St. Joseph Hosp. & Health Care Ctr. v. Dep't of Health*, 125 Wn.2d 733, 739-40, 887 P.2d 891 (1995). This test "serves as an additional filter

limiting the group which can obtain judicial review of an agency decision," but "'is not meant to be especially demanding.'" *Trades Council*, 129 Wn.2d at 797 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399, 107 S. Ct. 750, 93 L. Ed. 2d 757 (1987)).

We recognize that many decisions focus on the zone of interest test, recognizing that proof of injury-in-fact is not alone sufficient. *See St. Joseph Hosp.*, 125 Wn.2d at 739 ("The zone of interest test addresses the concern that mere injury-in-fact is not necessarily enough to confer standing because so many persons are potentially 'aggrieved' by agency action."). However, both parts of the standing test must be met, and, here, the Board has not adequately shown injury-in-fact. *See Allan*, 140 Wn.2d at 332 (a person has standing under RCW 34.05.530 "only when the zone of interest *and* injury-in-fact prongs are satisfied"). Accordingly, we need not analyze the zone of interest test.

Because the Board has failed to demonstrate injury-in-fact, the Court of Appeals correctly concluded it lacks standing to pursue this challenge to the Department's use of Policy 1070.

CONCLUSION

We affirm the Court of Appeals and hold the Board lacks standing to challenge the Department's denial of administrative division requests under Policy 1070. The Court of Appeals properly revoked the superior court's injunction and dismissed the Board's petition for judicial review.

_____
Stephens, J.

WE CONCUR:

_____  _____
González, C.J.            Yu, J.

_____  _____
Johnson, J.             Montoya-Lewis, J.

_____  _____
Madsen, J.             Whitener, J.

_____  _____
Gordon McCloud, J.        Leach, J.P.T.