IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| VANCOUVER AUDUBON SOCIETY; FRIENDS OF THE COLUMBIA GORGE; FRIENDS OF THE WHITE SALMON RIVER; CENTER FOR BIOLOGICAL DIVERSITY; and WILDEARTH GUARDIANS, <br><br> Appellants, <br><br> v. <br><br> WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES; HILARY FRANZ, in her official capacity as Commissioner of Public Lands; and WASHINGTON FOREST PROTECTION ASSOCIATION, <br><br> Respondents. | No. 86997-3-I <br><br><br> ORDER DENYING MOTION FOR RECONSIDERATION AND WITHDRAWING AND SUBSTITUTING OPINION |

Appellants Vancouver Audubon Society, Friends of the Columbia Gorge, Friends of the White Salmon River, Center for Biological Diversity, and WildEarth Guardians (collectively Appellants) filed a motion to reconsider the opinion filed on February 9, 2026, in the above case. Respondent the Department of Natural Resources filed an answer to the motion. A majority of the panel has determined that the motion for reconsideration should be denied. The panel has also determined that the opinion filed on February 9, 2026 should be withdrawn and a

substitute opinion filed to add statistical language on pages 4 and 13.  Now, therefore, it is hereby

ORDERED that Appellants' motion for reconsideration is denied.  It is hereby further

ORDERED that the opinion filed on February 9, 2026 shall be withdrawn and a substitute opinion shall be filed.

_____, ACJ

Birk, J. _____

_____

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| VANCOUVER AUDUBON SOCIETY; FRIENDS OF THE COLUMBIA GORGE; FRIENDS OF THE WHITE SALMON RIVER; CENTER FOR BIOLOGICAL DIVERSITY; and WILDEARTH GUARDIANS, | No. 86997-3-I |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF NATURAL RESOURCES; DAVE UPTHEGROVE, in his official capacity as Commissioner of Public Lands; and WASHINGTON FOREST PROTECTION ASSOCIATION, | |
| Respondents. | |

BOWMAN, A.C.J. — In December 2023, the Washington Department of Fish and Wildlife (WDFW) listed the western gray squirrel as a state endangered species. Under WAC 222-16-080(3), the Department of Natural Resources (DNR) must prepare and submit to the Forest Practices Board (Board) a "proposed list of critical habitats" of any newly listed endangered species within 30 days of its listing. Vancouver Audubon Society, Friends of the Columbia Gorge, Friends of the White Salmon River, Center for Biological Diversity, and WildEarth Guardians (collectively Audubon) allege that DNR and Hilary Franz, the

then-commissioner of public lands (collectively DNR),[1] failed to perform that duty.

Audubon petitioned for judicial review under the Administrative Procedure Act

(APA), chapter 34.05 RCW, and, in the alternative, for a writ of mandamus under

chapter 7.16 RCW.  Washington Forest Protection Association (WFPA)

intervened in the lawsuit as a respondent.  The trial court dismissed Audubon's

petition for review, concluding that Audubon lacked standing to sue, was not

entitled to relief under the APA, and failed to show that a writ of mandamus

should issue.  Because Audubon has standing to sue the DNR and its allegation

that DNR failed to perform a duty is reviewable under the APA, we reverse and

remand for the trial court to determine whether Audubon is entitled to relief under

RCW 34.05.570(4)(c).

FACTS

The Legal Framework

The Forest Practices Act (FPA), chapter 76.09 RCW, governs forest

practices on nonfederal forest lands in Washington.  *See* RCW 76.09.010.  The

purpose of the FPA is, among other things, to balance the use of forest resources

with the protection of wildlife.  RCW 76.09.010(1).

With the passage of the FPA, the legislature established the Board.  RCW

76.09.030.  And it created four "classes of forest practices," designated by their

degree of impact on public resources.  RCW 76.09.050(1).  "Class IV" forest

practices include those that "have a potential for a substantial impact on the

---

[1] We granted Audubon's motion to replace Franz with the current commissioner of public lands, Dave Upthegrove.

2

environment" and, as a result, may require review under the State Environmental Policy Act (SEPA), chapter 43.21C RCW. RCW 76.09.050(1)(Class IV)(d).[2] The Board is tasked with establishing by rule which forest practices are included in each class. RCW 76.09.050(1).

Under WAC 222-16-050(1), the Board designated certain forest practices as "Class IV-Special" and determined that those practices would require an "environmental checklist in compliance with [SEPA], and SEPA guidelines, as they . . . have potential for a substantial impact on the environment." Class IV-Special designations include the forest practices listed in WAC 222-16-080 on "lands designated as critical habitat (state) of threatened or endangered species." WAC 222-16-050(1)(b).

Class IV-Special designations for forest practices are intended to be "interim." WAC 222-16-080(5)(a). Under the WAC, the interim designations expire on the "effective date of a regulatory system for wildlife protection" or the "delisting" of the endangered species. *Id.* WAC 222-16-080(1) lists the endangered species for which the state's critical habitats have been identified and to which Class IV-Special designation applies. And WAC 222-16-080(3) outlines the steps DNR must take when the WDFW lists a new species as endangered.

Under WAC 222-16-080(3), to identify "forest practices which have the potential for a substantial impact on the environment with regard to [newly listed]

---

[2] "Class I" forest practices are minimal or specific forest practices that have "no direct potential for damaging a public resource." RCW 76.09.050(1)(Class I). "Class II" forest practices are those that have a "less than ordinary potential for damaging a public resource." RCW 76.09.050(1)(Class II). And "Class III" forest practices are any forest practice other than those contained in Class I, II, or IV. RCW 76.09.050(1)(Class III).

endangered species," the DNR "shall," after consultation with the WDFW,

> prepare and submit to the [B]oard a proposed list of critical habitats (state) of threatened or endangered species. This list shall be submitted to the [B]oard within 30 days of the listing of the species. The [DNR] shall, at a minimum, consider potential impacts of forest practices on habitats essential to meeting the life requisites for each species listed as threatened or endangered.

The critical habitats adopted by the Board are added to the list of Class IV-Special designations under WAC 222-16-080(1). *Id.*

### The Western Gray Squirrel

In 1993, the WDFW listed the western gray squirrel as a state threatened species. On December 28, 2023, the WDFW uplisted the western gray squirrel to endangered status based on its determination that the squirrel faced continued habitat loss, "limited ability to disperse due to habitat fragmentation," and road mortality. A WDFW study concluded that the main causes of habitat loss were "wildfire and timber harvest activities." Timber harvest includes both "thinning and clearcut" forest practices. The study noted that in Klickitat County, "canopy loss through thinning was so extensive that it was difficult to locate remnant patches suitable to conduct occupancy surveys."

On January 22, 2024, the WDFW provided the DNR with its "recommendations for conservation of the western gray squirrel" related to the species' recent uplisting to endangered status. The memo opined that timber harvest accounted for about 15 percent of habitat loss in the north Cascades western gray squirrel population and 76 percent in the south Cascades population. The WDFW recommended that the Board support the WDFW's initiation of a western gray squirrel "Wildlife Working Group." One of the

recommended goals of the working group was to "[c]onsider the requirements for [western gray squirrel] Critical habitat under WAC 222-16-[0]80."

On January 24, 2024, the DNR sent a memorandum to the Board. The memo noted:

> The Forest Practices Rules require the [DNR], within 30-days of a species listing, to:
>
> (1)  - Consult with the WDFW then
> (2)  - Submit to the [Board] recommendations on whether to amend its current critical habitats (state) protections.[3]

And it included the following recommendations:

> [R]equest WDFW to convene a western gray squirrel Wildlife Working Group involving landowners, tribes, agencies, and conservation partners potentially impacted by the uplisting to:
>
> (1)  Evaluate the existing volunteer measures completed to date and determine if they were implemented successfully and/or provided adequate protection.
> (2)  Develop new alternatives to enhance or rebuild the existing volunteer measures as needed.
> (3)  Consider the requirements for Critical habitat under WAC 222-16-[0]80.
> (4)  Develop recommendations on how to protect [western gray squirrel] habitat during timber harvesting and mitigation measures for land conversion by development. This could include conservation incentives and creating landscape approaches that encourage landowners to protect habitat.
> (5)  Consider whether developing new rules would provide benefit to the species or whether revised volunteer measures would work.
> (6)  Coordinate with DNR staff to ensure that all partners are represented in the evaluation process with a commitment

---

[3] The DNR misstates the requirement of WAC 222-16-080. Under the rule, the DNR must provide a list of proposed critical habitats for a newly endangered species, not a recommendation on whether it should amend the list. *See* WAC 222-16-080(3).

> to protect the western gray squirrel and its habitat
> through collaboration.

The DNR did not provide a list of proposed critical habitats in its memorandum.

On February 13, 2024, during public comment, Audubon submitted a comment to the Board.  It argued that WAC 222-16-080(3) required the DNR to submit a proposed list of critical habitats for the western gray squirrel by January 27, 2024.  The next day on February 14, the Board met and discussed the DNR's recommendation to convene a Wildlife Working Group.  DNR did not address or respond to Audubon's comment.

On February 23, 2024, Audubon petitioned for judicial review under the APA and, in the alternative, a writ of mandamus under chapter 7.16 RCW.[4]  The DNR moved to dismiss the petition under CR 12(b)(6), arguing Audubon failed to state a claim for which the court could grant relief because no "agency action" had occurred under the APA, Audubon lacked standing, and it failed to exhaust administrative remedies.  DNR also moved to dismiss the petition for a writ of mandamus, arguing mandamus was unavailable because its duty was not ministerial and Audubon had "adequate alternative legal remedies."  On March 18, 2024, WFPA, a timber industry trade organization, moved to intervene as a respondent.

In response to the motion to dismiss, Audubon filed several declarations from its members, describing the mission of Audubon and the importance of observing the western gray squirrel in its natural habitat.  On May 3, 2024, the

---

[4] On April 22, 2024, Audubon filed a "corrected" petition to fix a paragraph numbering error.

6

court held a hearing on the DNR's motion to dismiss and WFPA's motion to intervene. The court granted both motions. It concluded that Audubon lacked standing to sue the DNR under the APA and that Audubon could not seek judicial review of the DNR's failure to timely provide the Board with a list of proposed critical habitats.

Audubon appeals.

ANALYSIS

Audubon argues the trial court erred by dismissing its APA claims on summary judgment. It contends the record shows it has standing to sue the DNR, and the APA permits review of its allegation that the DNR failed to perform a duty.

We review a trial court's grant of summary judgment de novo.[5] *McDevitt v. Harborview Med. Ctr.*, 179 Wn.2d 59, 64, 316 P.3d 469 (2013). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c).

A defendant moving for summary judgment can challenge whether the plaintiff produced competent evidence to support the essential elements of their claim. *Boyer v. Morimoto*, 10 Wn. App. 2d 506, 519, 449 P.3d 285 (2019). The plaintiff must then provide sufficient evidence to support those elements. *Young*

---

[5] DNR moved to dismiss Audubon's APA claims under CR 12(b)(6). But in response, Audubon filed several declarations, asserting facts outside those contained in the complaint. As a result, the parties agree that DNR's motion to dismiss is converted to a motion for summary judgment and should be reviewed as such. *See* CR 12(b)(7) (If, on a motion to dismiss under CR 12(b)(6), matters outside the pleading are presented to the court, "the motion shall be treated as one for summary judgment and disposed of as provided in [CR] 56.").

*v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). The plaintiff may not rely on the allegations in their pleadings. *Id.* at 225-26. Instead, the plaintiff must respond with evidence setting forth specific facts to show that there is a genuine issue for trial. *Id.* at 225-26. We consider all facts submitted and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party. *Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000).

We also review issues of statutory interpretation de novo. *In re Guardianship of Beecher*, 130 Wn. App. 66, 70, 121 P.3d 743 (2005). When interpreting a statute, we first look to its plain language and meaning to determine legislative intent. *Id.* at 70-71. If the plain language is "unambiguous" and "subject to only one reasonable interpretation, our inquiry ends." *Spokane County v. Dep't of Fish & Wildlife*, 192 Wn.2d 453, 458, 430 P.2d 655 (2018). The rules of statutory interpretation also apply to administrative rules and regulations. *Wash. State Dep't of Licensing v. Cannon*, 147 Wn.2d 41, 56, 50 P.3d 627 (2002).

1. Standing

Audubon argues the court erred by concluding that it lacked standing to sue the DNR under the APA. We agree.

We review standing de novo. *In re Est. of Becker*, 177 Wn.2d 242, 246, 298 P.3d 720 (2013). The party seeking judicial review of an agency action bears the burden of establishing its standing. *See KS Tacoma Holdings, LLC v. Shorelines Hr'gs Bd.*, 116 Wn. App. 117, 127, 272 P.3d 876 (2012).

The standing of a nonprofit corporation to challenge government conduct that threatens to damage the environment is firmly established in federal jurisprudence, and Washington has adopted the federal approach. *Save A Valuable Env't v. City of Bothell*, 89 Wn.2d 862, 866-68, 576 P.2d 401 (1978). A nonprofit organization may represent its members in an action for judicial review so long as it shows that the government action specifically injured one or more of its members. *Id*. at 867.

> Organizations have standing to assert the interests of their members, so long as members of the organization would otherwise have standing to sue, the purpose of the organization is germane to the issue, and neither the claim nor the relief requires the participation of individual members.

*Five Corners of Fam. Farmers v. State*, 173 Wn.2d 296, 304, 268 P.3d 892 (2011).

Under the APA, a person has standing to obtain judicial review of agency action if that person "is aggrieved or adversely affected by the agency action." RCW 34.05.530. A person is aggrieved or adversely affected under this section "only when all three of the following conditions are present":

> (1) The agency action has prejudiced or is likely to prejudice that person;
> (2) That person's asserted interests are among those that the agency was required to consider when it engaged in the agency action challenged; and
> (3) A judgment in favor of that person would substantially eliminate or redress the prejudice to that person caused or likely to be caused by the agency action.

RCW 34.05.530; *see Allan v. Univ. of Wash.*, 140 Wn.2d 323, 326, 997 P.2d 360 (2000). We generally refer to the first and third prongs of RCW 34.05.530 as

"injury-in-fact" and the second prong as the "zone of interest." *Allan*, 140 Wn.2d at 326-27.

A. Injury-In-Fact

To show injury-in-fact, a plaintiff must demonstrate that it will be " 'specifically and perceptibly harmed' " by the agency's action. *Freedom Found. v. Bethel Sch. Dist.*, 14 Wn. App. 2d 75, 86, 469 P.3d 364 (2020) (quoting *Patterson v. Segale*, 171 Wn. App. 251, 259, 289 P.3d 657 (2012)). In other words, there must be "an invasion of a legally protected interest." *Snohomish County Pub. Transp. Benefit Area v. Pub. Emp't Rels. Comm'n,* 173 Wn. App. 504, 513, 294 P.3d 803 (2013).

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct are enough to show injury-in-fact because we presume that general allegations embrace those specific facts necessary to support the claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). But, in response to a summary judgment motion, the plaintiff cannot rely on mere allegations and must set forth by affidavit or other evidence specific facts, which we will take as true. *Id*. Still, the injury-in-fact requirement is not meant to be demanding. *City of Burlington v. Wash. State Liquor Control Bd.*, 187 Wn. App. 853, 869, 351 P.3d 875 (2015).

In *Lujan*, several nonprofit environmental and wildlife protection organizations challenged a rule, promulgated by the secretary of the interior, interpreting a section of the Endangered Species Act of 1973[6] that requires

---

[6] 16 U.S.C. § 1536.

consultation with the secretary for actions taken in only the United States or on the high seas.  504 U.S. at 558-59.  The organizations sued, seeking a declaratory judgment that the regulation was in error in its geographical scope and should include actions taken in foreign countries.  *Id.*  To show standing, members of the organizations filed affidavits, stating that they had traveled to foreign countries and observed the habitats of endangered Nile River crocodiles in Egypt and endangered Asian elephants and leopards in Sri Lanka but could not see any of these species directly.  *Id.* at 563.  One member noted in her declaration that she intended to go back to Sri Lanka but had no set plans to do so.  *Id.* at 563-64.

The Supreme Court recognized in *Lujan* that the "desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing."  504 U.S. at 562-63.  But to survive the injury-in-fact test at summary judgment, a nonprofit organization must show through affidavits or other evidence both (1) that the listed species are in fact being threatened by government action and (2) that one or more of its members are directly affected by the threat apart from their special interest in the subject.  *Id.* at 563.  The *Lujan* Court concluded that even assuming the organizations showed that the secretary's actions threatened endangered species, the members' " 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be"—did not support an injury-in-fact.  *Id.* at 564.

Here, viewing the evidence in a light most favorable to Audubon, it shows that the DNR's failure to act threatens the population of western gray squirrels. The record shows that the western gray squirrel is endangered from loss of habitat and that at least one of the causes for the loss stems from forest practices—thinning and clearcutting in critical habitats. According to the WDFW, those activities account for around 15 percent of the western gray squirrel's habitat loss in the north Cascades and 76 percent in the south Cascades. From that evidence, it is reasonable to infer that without an interim Class IV-Special designation for western gray squirrel critical habitats, those forest practices will continue without SEPA review, and the western gray squirrel population will keep declining. As Audubon points out, the DNR's failure to act "stands as a logjam" to the Board's consideration of such a designation. Forcing the DNR to provide a list of proposed critical habitats as required under the WAC would put the issue squarely before the Board, allow for public comment, and timely move the process forward as contemplated by the forest practice rules. *See* WAC 222-16-080; RCW 76.09.010.

And, unlike the environmental organizations in *Lujan*, several of Audubon's members filed declarations, explaining how the continued decline of the western gray squirrel directly affects them. The members declared that they personally study and monitor the western gray squirrel population, regularly visit and enjoy the species in its native habitat, and have plans to continue doing so in the near future.

For example, Noah Greenwald, a member of the Center for Biological Diversity, filed a declaration on April 22, 2024. Greenwald states:

> I regularly visit and enjoy the western gray squirrel's habitat in Klickitat County, and have personally observed western grays there on a number of occasions. This includes recent visits in 2023 and 2024, and planned future visits later in 2024.

Jennifer Schwartz, a member of WildEarth Guardians, also filed a declaration in April 2022, discussing her plans to interact with the western gray squirrel. She said:

> Since moving to Portland in 2003, I have enjoyed recreating in the Columbia River Gorge on at least an annual basis, and plan to continue doing so on a regular basis in the future. I particularly enjoy recreating in Klickitat County, Washington, in places featuring rare oak woodland habitats, including suitable habitat for the western gray squirrel.

These declarations go beyond the "some day" intentions that did not support a finding of actual or imminent injury in *Lujan.* Here, Audubon's members have concrete and regular plans to continue observing western gray squirrels in their habitats in Washington. As a result, Audubon sufficiently shows injury-in-fact.

### B. Zone of Interest

The zone-of-interest test "limits judicial review of an agency action to litigants with a viable interest at stake, rather than individuals with only an attenuated interest in the agency action." *City of Burlington*, 187 Wn. App. at 862. To satisfy the test, the party seeking standing must demonstrate that the legislature " 'intended the agency to protect the party's interests when taking the

13

action at issue.' " *Id.* at 863[7] (quoting *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 797, 920 P.2d 581 (1996)).

The purpose of the regulation at issue here is to "identify[ ] forest practices which have the potential for a substantial impact on the environment with regard to . . . endangered species newly listed by the [WDFW]." WAC 222-16-080(3). And the forest practices that the Board identifies as Class IV-Special must undergo SEPA review. WAC 222-16-050(1).

The legislature passed SEPA

(1) [t]o declare a state policy which will encourage productive and enjoyable harmony between humankind and the environment; (2) to promote efforts which will prevent or eliminate damage to the environment and biosphere; (3) . . . [to] stimulate the health and welfare of human beings; and (4) to enrich the understanding of the ecological systems and natural resources important to the state and nation.

RCW 43.21C.010.[8] And the legislature directed DNR to adopt the rules of SEPA, which DNR did. RCW 43.21C.120; *see* WAC 332-41-030. DNR's obligation to provide the Board with a list of proposed critical habitats for newly endangered species serves as a step toward identifying forest practices that may have a substantial impact on the species and to timely consider whether to impose interim protections from those practices.

As an individual organization, Audubon's stated purpose is to "promote and encourage the preservation and care for open, natural spaces as well as critical wildlife habitat throughout Washington State." Similarly, the Center for

---

[7] Internal quotation marks omitted.

[8] Third alteration in original.

Biological Diversity is an organization dedicated to the preservation, protection, and restoration of native species. And WildEarth Guardians is an organization that protects and restores the wildlife of "the American West." As discussed above, members of these organizations study and observe the western gray squirrel in its natural habitat. So, Audubon collectively is a litigant whose interests are among those that DNR's actions are intended to protect.

Audubon has met its burden of showing both injury-in-fact and that it is within the zone of interest. The trial court erred by concluding Audubon lacked standing to sue the DNR.[9]

2. Agency Inaction

Audubon argues that the court erred by concluding it could not seek judicial review of the DNR's failure to timely provide the Board with a list of proposed critical habitats. We agree.

Generally, the APA provides the exclusive means of judicial review of an agency action. RCW 34.05.510. And the APA prescribes the standard of review we use to determine whether agency action or inaction is valid. *See* RCW 34.05.570(1)(b). The burden of demonstrating the invalidity of agency action is on the party asserting invalidity. RCW 34.05.570(1)(a). The APA sets out different standards for judicial review depending on whether the court is reviewing rules, an adjudicative proceeding, or other agency action, including inaction. *See* RCW 34.05.570(2)-(4).

---

[9] Audubon also argues that it has procedural standing to challenge DNR's failure to act. Because we conclude that the DNR shows standing otherwise, we do not address this argument.

15

Under the APA, "[a] person whose rights are violated by an agency's failure to perform a duty that is required by law to be performed may file a petition for review pursuant to RCW 34.05.514." RCW 34.05.570(4)(b). A court may grant relief for a person aggrieved by an agency's failure to perform a duty if the court determines that the inaction is unconstitutional, outside the statutory authority of the agency, arbitrary or capricious, or taken by persons who were not lawfully entitled to do so. RCW 34.05.570(4)(c).

And under WAC 222-16-080(3), the DNR "shall," after consultation with the WDFW, "prepare and submit to the [B]oard a proposed list of critical habitats (state) of threatened or endangered species . . . within 30 days of the listing of the species." The word "shall" is presumptively imperative and creates a duty. *Erection Co. v. Dep't of Lab. & Indus.*, 121 Wn.2d 513, 518, 852 P.2d 288 (1993). So, under WAC 222-16-080(3), the DNR had a duty to prepare and submit to the Board a list of proposed critical habitats within 30 days of the WDFW listing the western gray squirrel as an endangered species. It did not do so.

The DNR argues that it performed its duty under the rule because it "provided its recommendations to the Board regarding critical habitat for the western gray squirrel." But the DNR did not provide a list of proposed critical habitats as required by the rule. Instead, the DNR submitted a memorandum to the Board recommending, among other things, that the Board form a Wildlife Working Group that would "[s]ubmit to the [Board] recommendations on whether to amend its current critical habitats (state) protections" related to the western

gray squirrel. Viewed in a light most favorable to Audubon, the record shows that the DNR failed to perform its duty under WAC 222-16-080(3).

The DNR also argues that Audubon is not a "person whose rights have been violated" under the APA by its failure to act. But the APA defines "person" as "any individual, partnership, corporation, association, governmental subdivision or unit thereof, or public or private organization or entity of any character, and includes another agency." RCW 34.05.010(14). Audubon meets that definition as a private organization. And, as discussed above, Audubon alleges sufficient facts that, if true, show the DNR violated its members' rights to observe and enjoy an animal species.

Because Audubon has standing to sue the DNR and its allegation that the DNR refused to perform a duty is reviewable under the APA, we reverse and remand for the trial court to determine whether Audubon is entitled to relief under RCW 34.05.570(4)(c).[10]

_____, ACJ

WE CONCUR:

_____        _____

---

[10] Because we conclude that Audubon alleges sufficient facts to support a cause of action under the APA for failure to act, we do not address its arguments that the DNR's memorandum also amounts to agency action reviewable under the APA or, in the alternative, that it is entitled to a writ of mandamus under chapter 7.16 RCW.

17